1
2
3
4
5
6
7       **IN THE UNITED STATES DISTRICT COURT**

8       **FOR THE DISTRICT OF ARIZONA**

9                                          )
   United States of America,              )      CR 07-1541-TUC-RCC (JCG)
10                                         )
               Plaintiff,                  )      REPORT AND RECOMMENDATION
11                                         )
   vs.                                     )
12                                         )
   Manuel de Jesus Zamarron-Ruiz,          )
13                                         )
               Defendant.                  )
14  _____   )

15          On October 31, 2007, Defendant Manuel de Jesus Zamarron-Ruiz filed a Motion to

16  Suppress. (Doc. No. 12.) On November 9, 2007, the government filed a Response. (Doc. No.

17  18.)  Defendant did not reply.  This matter came before the Court for a hearing and a report

18  and recommendation as a result of a referral made on August 6, 2007, pursuant to LRCrim

19  5.1.

20          Defendant's Motion was set for evidentiary hearing and evidence was heard on

21  November 28, 2007, November 30, 2007 and December 6, 2007.  Argument was heard on

22  December 19, 2007.  Defendant, who is presently in custody, was present and represented

23  by counsel.  This matter was submitted following oral argument at the conclusion of the

24  hearing on December 19, 2007, and taken under advisement.

25          The Defendant's Motion seeks suppression of Defendant's statements on the grounds

26  that the statements were not voluntary because the Defendant was promised that his family

27  would not be prosecuted if he took responsibility for contraband found in the vehicle he was

28

driving.  Having now considered the matter, the Magistrate Judge recommends that the District Court, after its independent review, DENY Defendant's Motion to Suppress.

### FACTUAL FINDINGS

The parties provide the following uncontested facts in their pleadings: On August 1, 2007, at approximately 6:30 p.m., Defendant drove a Dodge Ram pickup truck from Mexico to the Lukeville Port of Entry.  Defendant's wife, Socorro Peinado, and adult son, Jorge Zamarron-Peinado, were traveling with him.  United States Customs and Border Protection ("CBP") Officer Neumann approached Defendant's vehicle at the Port of Entry.  Officer Neumann ran a records check and discovered that a "look-out" had been placed on Defendant by agents in Tucson, Arizona, who believed that Defendant was a possible narcotics smuggler.  Defendant's vehicle was referred to secondary inspection.  A search of the pickup revealed sixteen plastic wrapped packages of cocaine, with a total weight of approximately 15.17 kilograms, located in a speaker cabinet behind the seat.  Defendant, his wife and son were detained by CBP officers; Defendant was placed in a cell separate from his family members.

CBP Officer Ballesteros, Immigration and Customs Enforcement ("ICE") Senior Special Agent Leander Mase and CBP Officer Herrera testified on behalf of the government.  Officer Ballesteros testified that he was on duty at the Lukeville Port of Entry on the night of August 1, 2007.  A few hours after Defendant was detained, Officer Ballesteros removed him from the cell for fingerprinting. (Tr. 11/28/07 pg. 88.) According to Officer Ballesteros, while he was directing Defendant to provide fingerprints, Defendant spontaneously stated to Officer Ballesteros that his family was innocent and that they did not know what was going on.  (*Id*. at pg. 89.)  Officer Ballesteros told Defendant that another agent would be coming to talk to him and that he could talk to that agent; this comment effectively stopped Defendant from making any further statements.  (*Id*.)

Agent Mase testified that he arrived at the Lukeville Port of Entry at approximately 11:30 p.m. on the evening of August 1, 2007.  He was debriefed by Officer Neumann and spoke with Officer Ballesteros.  (Tr. 11/28/07, pg. 7.)  After reviewing documents and

collecting evidence, he began interviewing Defendant's son at approximately 2 a.m. (*Id.*) The interview was conducted in the conference room of the Lukeville office. (*Id.* at pg. 8.) Because Agent Mase does not speak Spanish, and Defendant and his family speak only Spanish, CBP Officer Rick Herrera acted as interpreter. (*Id.*) Agent Mase's interview with Defendant's son ended at approximately 3 a.m., after which Agent Mase interviewed Defendant's wife. (*Id.* at pgs. 11-12.) This interview was also conducted in the conference room and Officer Herrera again served as interpreter.

According to Agent Mase, he interviewed Defendant beginning at approximately 4:45 a.m. (Tr. 11/28/07, pg. 14.) This interview was also conducted in the conference room with Officer Herrera serving as interpreter. (*Id.*) Agent Mase testified that Defendant was calm throughout the interview and did not appear tired or anxious. (*Id.* at pg. 16.) Agent Mase began the interview by explaining to Defendant that he had been arrested because drugs had been discovered in his vehicle. (*Id.* at pg. 17.) Agent Mase then read Defendant his *Miranda* rights. (*Id.*) Agent Herrera presented Defendant with a statement of rights form written in Spanish; Defendant reviewed the form and signed it. (*Id.* at pgs. 19-20.) Agent Mase then interviewed Defendant for approximately one hour. (*Id.* at pg. 20.)

According to Agent Mase, Defendant stated during the interview that he had been hired by a man named Jorge Escalante to drive a vehicle into the United States. (*Id.* at pgs. 23-24.) Defendant stated that Jorge Escalante had been interested in hiring Defendant because he had previously worked with the Mexican government as a Customs Inspector. (*Id.*) According to the Defendant, this was the second job he had done for Escalante. A few months earlier, Defendant and a son (not Jorge) had driven a vehicle to Boulder City, Nevada at Jorge Escalante's instruction. (*Id.* at pgs. 24, 45.) Defendant was paid $3,000 for this run.[1] (*Id.* at pg. 70.) Defendant told Agent Mase that, prior to the second trip on August 1, 2007, he was instructed by Escalante to drive the truck in which he was arrested into the United

_____

[1] Officer Herrera testified that Defendant also told Agent Mase that he had been suffering from financial difficulties for some time prior to agreeing to work for Jorge Escalante. (Tr. 12/6/07, pg. 32.)

1    States to a hotel in Phoenix, Arizona.  (*Id*. at pgs. 46, 71.)  Defendant also stated that he was

2    instructed to cross at Lukeville because a truck had been intercepted at the Nogales Port of

3    Entry the previous week.  (*Id*.)  Defendant stated that he was going to be paid $3,000 for the

4    August 1, 2007 run.  (*Id*. at pg. 71.)  Defendant showed Agent Mase his cell phone, in which

5    he had programmed Jorge Escalante's phone number.  (*Id*. at pg. 69.)   Defendant admitted

6    to Agent Mase that he assumed there was something illegal hidden in the truck on August

7    1, and that he believed that his prior run had involved cocaine.  (*Id*. at pgs. 72-73.)

8         Toward the end of the interview, Defendant became emotional and asked what would

9    happen to his wife and son.  (*Id*. at pg. 21.)  Agent Mase told Defendant that he did not know

10   what would happen to Defendant's wife and son, because the decision whether to prosecute

11   them was not up to him.  (*Id*.)  Agent Mase also told Defendant that Defendant's wife and

12   son might have their border crossing cards revoked, but that the decision whether to revoke

13   the cards was not up to Agent Mase either. (*Id*.)  Agent Mase testified that he never promised

14   Defendant that if Defendant confessed to the crime, his wife and son would not be

15   prosecuted.  (*Id***.** at pgs. 22, 75.)

16        Agent Mase testified that, following his interview with Defendant, he contacted the

17   United States Attorneys' Office, which declined to prosecute Defendant's wife or son but

18   authorized the prosecution of Defendant.  (Tr. 11/28/07 at pg. 25.)  Agent Mase provided

19   Defendant with an opportunity to say goodbye to his family before Defendant was

20   transported to Tucson.  (*Id*. at pg. 26.)

21        Officer Herrera testified that he served as the interpreter during Agent Mase's

22   interview with Defendant.  (Tr. 12/6/07, pg. 6.)  According to Officer Herrera, Defendant did

23   not appear to have any problems understanding Officer Herrera's translations.  (*Id*. at pg. 12.)

24   Officer Herrera translated everything that Agent Mase said to Defendant and everything that

25   Defendant said to Agent Mase.  (*Id*. at pg. 24.)  Agent Herrera testified that at the beginning

26   of Defendant's interview with Agent Mase, before Defendant was given his *Miranda* rights,

27   Defendant spontaneously stated that he was going to take full responsibility for what had

28   happened and that his family had nothing to do with it. (Tr. 12/6/07, pgs. 34, 41.)  According

1    to Officer Herrera, neither Officer Herrera nor Agent Mase stated to Defendant that if

2    Defendant confessed to the crime, his family would be allowed to go free. (Tr. 12/6/07, pg.

3    11.)

4           Defendant, his wife and his son testified on Defendant's behalf.  Defendant offered

5    testimony contradicting the testimony offered by the Officers and Agent Mase.  Defendant

6    stated that when he drove to Nevada with his son, the purpose of the trip was to cheer up his

7    son because his son had recently suffered a serious injury.  (Tr. 11/30/07, pgs. 8-10.)

8    Defendant stated that he and his son had driven to Las Vegas in a truck belonging to Jorge

9    Escalante. (*Id*. at pg. 10.) Defendant described Jorge Escalante as a long-time family friend.

10   (*Id*.) According to Defendant, the trip from Hermosillo, Mexico, to Las Vegas, Nevada and

11   back had lasted two days. (*Id*.) Defendant also testified that, on the day of his August 1,

12   2007 arrest, he and his family were traveling from Hermosillo to Phoenix, Arizona in order

13   to purchase school supplies for his youngest son. (*Id*. at pgs. 12-13.) The family decided to

14   drive through the Lukeville Port of Entry so that they would pass through Rocky Point,

15   Mexico and Sonoyta, Mexico. (*Id*. at pg. 11.) Defendant's wife had never seen Rocky Point,

16   and the family hoped to visit another son who was living in Sonoyta. (*Id*. at pgs. 11-12, 32.)

17   Defendant and his family were not able to find the son that lived in Sonoyta. (*Id*. at pg. 11.)

18   According to Defendant, on the August 1 trip Defendant was driving a vehicle borrowed

19   from a friend in order to avoid wear and tear on his own car. (*Id*. at pg. 14.)  Defendant also

20   testified that when he was removed from his cell to be fingerprinted by Officer Ballesteros,

21   he asked where his wife and son were, but did not tell Officer Ballesteros that they were

22   innocent or that they did not know what was going on. (*Id*. at pg. 19.)

23          Defendant admitted to waiving his *Miranda* rights at the outset of his interview with

24   Agent Mase, but testified that he was surprised to learn that there were drugs in his vehicle.

25   (*Id*. at pgs. 20-21.) Defendant testified that he asked about his family at the beginning of his

26   interview with Agent Mase, before he was given his *Miranda* rights, and that Agent Mase

27   told him his family could be put in jail. (*Id*. at pg. 22.) According to Defendant, Agent Mase

28   told him that if he admitted that he was guilty, his wife and son could go free. (*Id*. at pg. 23.)

1  Defendant then invented a statement concerning the drugs discovered in his vehicle that

2  "mixed some truth and some fantasy" in an attempt to create a confession that would seem

3  believable enough for his wife and son to go free.  (*Id.*)  Jorge Escalante was the first name

4  that came to Defendant's mind when he told Agent Mase that he had been hired to drive a

5  vehicle into the United States.  (*Id.* at pg. 28.)

**ANALYSIS**

7  Defendant challenges the admissibility of his inculpatory statements to Agent Mase

8  on voluntariness grounds.[2]  Defendant contends that his confession to Agent Mase was not

9  voluntary because it was made in reliance on a promise from Officer Herrera that, if

10  Defendant would confess to transporting drugs, Defendant's family would not be prosecuted.

11  The burden is on the government to show that a defendant was aware of his rights and

12  that he waived them. *See United States v. Cazares*, 121 F.3d 1241, 1244 (9th Cir.1997). In

13  order for a confession obtained during a custodial interrogation to be admissible, any waiver

14  of a defendant's *Miranda* rights must be voluntary, knowing, and intelligent. *See United*

15  *States v. Vallejo*, 237 F.3d 1008, 1014 (9th Cir.2001)(citing *Miranda v. Arizona*, 384 U.S.

16  _____

17  [2] Defendant denies making a spontaneous admission of guilt to Officer Ballesteros or

18  Officer Herrera and claims that any spontaneous statement made to Officer Herrera occurred
   after Herrera promised Defendant that his family would go free if Defendant confessed.  If

19  such statements were spontaneously made, and not the product of interrogation, there was
   no *Miranda* violation. *See Miranda v. Arizona*, 384 U.S. 436, 478 (1966) (voluntary

20  statements not subject to Miranda warnings); *United States v. Booth*, 669 F.2d 1231, 1237

21  (1981) (spontaneous or volunteered statement of suspect in custody admissible in absence
   of Miranda warnings).  The parties agreed during argument that whether or when Defendant

22  made the spontaneous statements is an issue for the jury to decide and cannot be challenged
   in a motion to suppress, although the Defendant still contends that the Court must decide the

23  voluntariness of the Defendant's alleged statement to Herrera because, if made, it was made

24  after promise that rendered the statement involuntary.  The Court notes  that Defendant did
   not offer evidence to contradict Officer Herrera's testimony that, at the beginning of

25  Defendant's interview with Agent Mase, as soon as the Defendant sat down and before any

26  questions were asked, Defendant spontaneously stated that he was going to take full
   responsibility for what had happened and that his family had nothing to do with it.  (Tr.

27  12/6/07, pgs. 34, 41.)  Given this undisputed testimony, there is no basis for concluding that
   the alleged statement could have been the result of any promises as there is no testimony to

28  support the conclusion that any promise had been made at the point of the spontaneous
   statement.

1    436, 479 (1966)).  The government has the burden to prove that a statement was voluntary

2    by a preponderance of the evidence. *See United States v. Bautista*, 362 F.3d 584, 589 (9th

3    Cir.2004). "In evaluating voluntariness, the test is whether, considering the totality of the

4    circumstances, the government obtained the statement by physical or psychological coercion

5    or by improper inducement so that the suspect's will was overborne." *Bautista*, 362 F.3d at

6    589 (internal citation omitted). In considering the totality of the circumstances, factors to

7    consider include the presence of any police coercion, the length of the interrogation, its

8    location and its continuity, whether the police advised the suspect of her rights, and whether

9    there were any direct or implied promises of a benefit.  *Clark v. Murphy*, 331 F.3d 1062,

10   1072 (9th Cir.2003).  To be knowing and intelligent, "the waiver must have been made with

11   a full awareness of both the nature of the right being abandoned and the consequences of the

12   decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). "In short the true test

13   of admissibility is that the confession is made freely, voluntarily, and without compulsion or

14   inducement of any sort." *Haynes v. State of Washington*, 373 U.S. 503, 513-14 (1963).  A

15   promise only vitiates consent if it is "sufficiently compelling to overbear the suspect's will

16   in light of all attendant circumstances." *United States v. Leon Guerrero*, 847 F.2d 1363, 1366

17   (9th Cir.1988).

18        The government has met its burden in demonstrating that Defendant voluntarily

19   waived his rights.  The government submitted evidence that Defendant was read his *Miranda*

20   rights in Spanish, that Defendant received a waiver of rights form written in Spanish, and that

21   Defendant signed the waiver of rights form.  Defendant testified that he understood his

22   *Miranda* rights and was willing to waive them.[3]  (Tr. 11/30/07 at pgs. 36-37.)  The totality

23

24        [3]Although Defendant suggested in his Motion that his confession was also induced
     because Defendant had been deprived of food and water for more than ten hours, this
25   argument was not supported during the evidentiary hearing and defense counsel withdrew
     this component of her motion during argument.  Defendant testified that he never asked for
26   food or water. (Tr. 11/30/07, pg. 34.) Officer Ballesteros testified that Defendant asked him
     for water and he gave him some. (Tr. 11/28/07, pg. 90.) Agent Mase testified that Defendant
27   never requested food or water or complained of being hungry or thirsty. (*Id*. at pgs. 20, 30-
     31.)  Defendant had access to water in his cell and was given a cup of water during his
28   interview. (*Id*. at pgs. 21, 29.)  In addition, the cell had a bench on which Defendant could

1   of the circumstances further support a finding that Defendant's waiver was not coerced.

2   Defendant was interviewed in a conference room; there is no evidence that the conference

3   room was in any way an inherently coercive environment.  Defendant is well educated and

4   understood the interrogation process; he is an attorney (Tr. 11/30/07 at pg. 6), had previously

5   worked as a customs inspector,  (*Id*. at pg. 48) found the interpreter to be fluent in Spanish

6   and had no problems understanding him.  (*Id*. at pgs. 34-35.)  Defendant also testified that

7   he felt comfortable during the interview.  (*Id*. at pgs. & 37.)

8        Defendant has failed to demonstrate that his confession was induced by a promise

9   from the officers that if he confessed, his family would not be prosecuted.  Agent Mase and

10   Officer Herrera both denied making such a promise.  Defendant testified that his confession

11   was induced by a promise and testified at great length about the falseness of the statements

12   that he made to Agent Mase during the interview.[4]  Defendant, however, was not credible.

13        First, Defendant's statements to Agent Mase were extremely detailed and provided

14   plausible explanations as to how he came to be transporting drugs through the Lukeville Port

15   of Entry.  Defendant told Agent Mase numerous details of his employment with Jorge

16   Escalante including being employed to drive a prior load of what he suspected to be cocaine.

17   Defendant told Agent Mase that he agreed to work for Jorge Escalante because he had been

18   suffering financial problems for some time.  (Tr. 12/6/07, pg. 32.)  He described driving

19   Jorge Escalante's Ford Lobo pickup truck with his son to Las Vegas, parking it at a three-

20   story motel, spending the night in the hotel and then checking out the next day to return to

21   Hermosillo, where he was paid $3,000.  (Tr. 11/30/07, pg. 49, 50-51.)  Defendant also

22

23   lay down.  (*Id*. at 29.)

24        [4]Whether the Defendant provided truthful statements to Agent Mase would not usually

25   be relevant in determining whether the Defendant's statements were obtained by a promise.
     However, in this case, Defendant suggested that his false statements to Agent Mase

26   demonstrated that his confession was the result of a promise that his family would go free.

27   According to the Defendant, the amount of detail that he provided to Agent Mase and the fact
     that the details were based in part on true events in his life prove that he was trying very hard

28   to convince Agent Mase of his responsibility for the load to ensure his wife and son's release.

provided many details regarding his August 1, 2007 trip from Hermosillo to the Lukeville
Port of Entry.  He told Agent Mase he was contacted by Jorge Escalante on July 29, 2007
with instructions to drive the vehicle across the border at Lukeville, that Escalante selected
Lukeville as the crossing point because a truck had been intercepted at Nogales the week
before, that Defendant told his wife and son they were going to Phoenix to get school
supplies, and that he would be paid $3,000 to drive the vehicle to a hotel in Phoenix,
Arizona.  (*Id*. at pgs. 49-51.)  The numerous details that he provided on his own initiative
support a conclusion that the details provided were truthful and that the Defendant, at least
at that time, had decided to take responsibility for his actions.  The details he provided
credibly explained why the Defendant and his family would travel so far out of their way to
cross into the United States at the Lukeville Port of Entry.

In contrast, the testimony offered by Defendant at the hearing was not believable.
Defendant claimed that he and his son drove from Hermosillo to Las Vegas in order to cheer
up his son.  Defendant admitted, however, that the entire trip lasted only two days.  Given
the driving time between Hermosillo to Las Vegas, a two-day trip would leave little time for
fun in Las Vegas.   In addition, Defendant claimed that, on August 1, he and his family
decided to travel from Hermosillo to Phoenix via the Lukeville Port of Entry in order to see
Rocky Point and possibly visit Defendant's son in Sonoyta.  As Defendant describes it, the
visit to the son was a last-minute decision and they were not able to locate the son when they
arrived.  It seems unlikely that Defendant and his family would travel such a distance to visit
a relative without first ensuring that the relative was available.

Further, Defendant's claim that his confession to Agent Mase "mixed some truth and
some fantasy" in an attempt to create a confession that would seem believable enough for his
wife and son to go free is not credible.  It would make no sense for Defendant to implicate
one of his sons and a family friend in drug runs in order to save his wife and another son
from prosecution.  In addition, there would be no need for Defendant to create a believable
story regarding the drug runs, particularly a prior drug run which was never raised by law
enforcement officers; if Defendant intended to confess for the sake of saving his family, he

- 9 -

could have merely stated that he committed the present crime without providing any details as to how it was committed or describing past acts of committing the same offense or implicating his son in a prior drug transaction.  Moreover, the Defendant's testimony that his statements to Agent Mase mixed truth and fantasy also tend to show that he is willing and able to make false statements to serve his own purposes; it can not be disputed that either the Defendant's statements to Officer Mase were lies or his testimony to the Court was untruthful.  As noted above, the Defendant's statements to Officer Mase are much more believable than his testimony to the Court - which definitively was not.

Conversely, the testimony provided by Agent Mase, Officer Ballesteros and Officer Herrera was credible. Each of the agents/officers maintained a professional and calm demeanor on the stand and demonstrated an ability to reliably perceive and remember the facts to which he testified.   The agents/officers offered plausible testimony that was consistent with the testimony of other officers and witnesses.  Although, during argument, defense counsel pointed out some inconsistencies in the testimony of Agent Mase and Officer Herrera, those inconsistencies did not relate to the facts relevant to the issue of whether Defendant's confession was induced by a promise.   In addition, Officer Ballesteros' and Officer Herrera's testimony that Defendant spontaneously confessed twice before his interview with Agent Mase is consistent with Officer Herrera's and Agent Mase's testimony that Defendant confessed after he was given his *Miranda* rights and that no promises were made to the Defendant.  If Defendant did readily confess, no promises would be necessary to extract a confession.  Here, two officers testified that Defendant confessed spontaneously before the interview began.  The agent's/officers' testimony supports an overall conclusion that Defendant, from the time he was arrested, consistently acted out of concern for his family's well-being and had the intent to shoulder criminal responsibility.

Accordingly, the Court finds that Defendant was not a credible witness and that his testimony that he confessed in reliance on a promise from the officers is not reliable.  The Court finds merit in the officers' assertion that no such promise was made, and concludes that Defendant's statements are admissible.

**RECOMMENDATION**

In view of the foregoing, it is recommended that, after its independent review of the record, the District Court: DENY Defendant's Motion to Suppress (Doc. No. 12) because the Defendant's statements to Officers Herrera and Ballesteros were spontaneous statements and the Defendant's statements to Agent Mase were voluntary.  The parties have ten (10) days to serve and file written objections to the Report and Recommendation.  The parties are advised that any objections should be filed with the following caption: **CR 07-1541-TUC-RCC**.

DATED this 21st day of December, 2007.

_____
Jennifer C. Guerin
United States Magistrate Judge